**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

WARREN CHASE #326-514                    :

    Petitioner

    v.                                                        :   Civil Action No. CCB-09-955

COMMISSIONERS OF MARYLAND
DOC  et al.                                             :

    Respondents                    …o0o…

## MEMORANDUM

Pending is a 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Warren Chase ("Chase"), challenging his convictions in the Circuit Court for Anne Arundel County, Maryland for armed robbery and related offenses. Counsel for respondents has filed a response to which Chase has replied.[1]  Upon careful review of the pleadings, transcripts, and applicable law, the court determines an evidentiary hearing is unwarranted.

## BACKGROUND

Chase was convicted by a jury of armed robbery, robbery, first-degree assault, second-degree assault, use of a handgun in the commission of a crime of violence, carrying a handgun, reckless endangerment, theft, and conspiracy.  On July 19, 2005, he was sentenced on the armed robbery conviction to a twenty-year term of incarceration with fifteen years suspended and five years probation.  He

---

[1] In Paper No. 4, Chase requests this court consider new grounds involving ineffective assistance of counsel based on counsel's failure to meet with him and judicial misconduct involving the trial court's recent decision to not place him on probation in a community mental health setting.  In Paper No. 5, Chase seeks to add as exhibits documents concerning other actions not directly related to these proceedings, and requests recusal of the undersigned based on past dismissals of his previous lawsuits.  In Paper No. 17, Chase requests default judgment based respondents' delay in responding to his petition.  These motions are without merit and are hereby denied.

received a five-year mandatory term of incarceration without parole consecutive

to the robbery sentence on the use of a handgun conviction, one year and one day

concurrent on the conviction for carrying a handgun, and concurrent five-year

sentences on the convictions for reckless endangerment and conspiracy.   The

remaining convictions were merged at sentencing.

> The Court of Special Appeals summarized the facts as follows:
>
> At 10 p.m. on November 25, 2003, Thomas Robinson was robbed and assaulted at gunpoint by three men as he was offloading furniture from a moving truck in a parking lot on Riva Road in Annapolis.  The appellant and two other men, Albert Sublet and Kenneth Goss, were charged with  offenses related to the robbery and assault.  Goss entered into a plea agreement with the State prior to trial. [footnote 2]  Sublet pleaded guilty to assault. [footnote 3]
>
> The case against the appellant was tried to a jury on May 17 and 18, 2005. Three witnesses testified for the State: Robinson, Goss, and Detective        Clifford an Hoesen.   The appellant did not call any witnesses or testify on  his own behalf.  Goss testified that, on the   night of the robbery, he had been told to leave his grandparents' house,   where he had been living, and needed to find a hotel room for the  night.  He was in the company of Sublet, his friend; the appellant, an acquaintance of Sublet; Rebecca Goss,his sister and the mother of Sublet's child; and Amanda Donohue, hiscousin. Goss had never met the appellant before that night.  Donohue drove the four others to a Day's Inn and dropped them off. [footnote 3] After inquiring about the nightly rates, the group discovered that they did not have enough money to rent a room.  The appellant suggested that they rob  someone.  The appellant and  Sublet began walking down the street and Goss caught up with them.  The three men stopped at a Giant Food  parking lot on Riva Road, but did not see any potential victims.  The three men then walked to a Bank of America parking lot where they encountered Robinson unloading furniture from a truck.

____

Footnote two of the appellate decision reads:

During the sentencing hearing,the prosecutor proffered to the court that Sublet had been willing to cooperate with the State, but the State had chosen not to use

2

his testimony because Sublet recently had been shot in the head and his competency was questionable.

Footnote three of the appellate decision reads:

Goss testified that another person, last name Ramirez, also was present, at the Day's Inn.  The record does not reflect anything else about this person or whether he or she was in the car with the group previously.

Both Goss and Robinson described the robbery as follows.  Robinson was standing at the back of a 24-foot moving truck.  The appellant and Sublet both donned masks that covered their nose, mouth, ears, and hair. [footnote omitted] The appellant was armed with a handgun.

The appellant and Sublet approached Robinson from both sides of the truck.  Goss stayed near the front of the truck on the passenger side, out of Robinson's sight.  The appellant directed Robinson to hand over his money.  Robinson complied, giving him $3.  The appellant told Sublet to pat Robinson down.  Sublet did, recovering some change and finding a wallet in Robinson's pocket.  Sublet directed Robinson to remove his wallet and Robinson did, showing the two men that his wallet was empty.  The appellant ordered Robinson into the back of the truck.  Robinson climbed in and walked half-way into the back of the truck.  The appellant and Sublet climbed onto the back of the truck behind him and started to pull the door closed.  Suddenly, Robinson ran towards the appellant and tackled him.  The appellant and Robinson fell to the ground off the back of the truck.  Sublet began hitting and kicking Robinson.  The appellant began beating Robinson over the head with the butt of the handgun.

While the appellant and Sublet were fighting with Robinson, Goss approached from around the side of the truck.  Robinson testified that Goss did not assault him; however, in his written statement to the police one week after the assault, he said that Goss "joined the other two in hitting me and kicking me. [footnote 5]  Goss testified that he yelled "cops!" to frighten the appellant and Sublet and to stop them from beating Robinson.

Robinson managed to escape and run into the bank.  Acquaintances of Robinson inside the bank called the police.  When the police arrived at the scene, Robinson described the two men who initially approached him as black males, both wearing masks that covered their faces except for their eyes, both around six feet tall with thin builds.  He described the third man as a light-skinned black male or a white male who was shorter than the other two men.

Robinson was taken to the Anne Arundel County Medical Center where

he was treated for a head injury.
_____

Footnote five of the appellate decision reads:

Robinson's written statement to the police, while marked as a defense exhibit,
was never moved into evidence and is therefore not a part of the record before us.
The portion of the statement that we quote was read by defense counsel to
Robinson during cross-examination.


According to Goss, after Robinson ran into the bank, he, Sublet, and
the appellant  ran back toward the Day's Inn.  There were police in the
area responding to Robinson's 911 call and a helicopter was circling
overhead.  Goss and the appellant ran into a graveyard behind the hotel to
hide. [footnote omitted] Then, according to Goss, the appellant, who was
still armed with a handgun, robbed him. [footnote omitted]

The appellant suggested that Goss report a robbery in order to throw
the police off their trail.  Goss stripped off some of his clothes to make it
appear that he had been robbed and called the police from a Shell gas
station across the street, pretending to be his brother, Timothy Goss.  At
10:27 p.m., the police received a second report of a robbery from a caller
identifying himself as Timothy Goss.  The caller reported that he had been
robbed that same evening by three white males in the vicinity of the Bank
of America.  [footnote omitted]

The next day, Detective Van Hoesen was assigned to investigate
both robbery reports.  Detective Van Hoesen testified that, in the course of
his investigation of the first robbery, he developed three suspects:  Sublet,
Goss, and the appellant.  The detective also determined that the second
robbery report had not been made by Timothy Goss, but by his brother,
Kenneth Goss.

Six days later, on December 2, 2003, Detective Van Hoesen
interviewed Robinson and took a written statement.  Detective Van Hoesen
also presented Robinson with two photo arrays:  the first containing a
picture of Sublet and the second containing a picture of the appellant.
Robinson was unable to identify any of the men in the first photo array.
Upon viewing the second photo array, Robinson used his thumb to cover
the nose and mouth area of the photograph of the appellant.  He then did
the same with two other photos in the array before identifying the appellant
as the armed assailant.  Robinson stated, "I'm sure.  I got a good look at
him."

Two days later (December 4), the police arrested Goss and Sublet together.  Goss was charged with armed robbery, robbery, and first and second-degree assault.  Goss gave a statement to the police in which he implicated the appellant as the armed assailant and Sublet as the second assailant who first approached Robinson.  Goss also admitted his involvement in the crime, identifying himself as the third assailant.  Goss claimed, however, that his involvement was limited to acting as a lookout and that he did not otherwise participate in the crime.

The appellant was arrested on February 1, 2004.

Goss and the appellant both were incarcerated at the Anne Arundel County Detention Center while awaiting trial.  Goss testified that, during that time, the appellant asked him to sign an affidavit saying that he (the appellant) was not involved in the robbery.  Also, when Goss was being transported to court with the appellant and Sublet, the appellant threatened to kill both men if they testified against him.

On June 17, 2003, Goss entered into a plea agreement that called upon him to cooperate in the investigation and plead guilty to second-degree assault, which carries a maximum sentence of ten years' incarceration, in exchange for the State's dismissing the other charges against him and making a favorable sentencing recommendation.  The State agreed to recommend a sentence of "four years suspended, allowing for credit for [time served]" with a period of supervised probation.  The State also agreed not to oppose Goss's release on home detention pending sentencing.

In January of 2005, Goss was sentenced to a term of four years' incarceration, with all but six months suspended.

Paper No. 16, Exhibit 8 at 2-7.

## PROCEDURAL HISTORY

Chase raised five claims of error on appeal:

1.    Did the prosecutor misstate the law during closing arguments?

2.    Was the evidence legally sufficient to sustain appellant's convictions?

3.    Did the circuit court err in limiting the impeachment of a witness for the State?

5

> 4.     Did the circuit court err in imposing separate sentences for the convictions of carrying a handgun and use of a handgun in the commission of a crime of violence? And
>
> 5.     Did the circuit court err in imposing separate sentences for the convictions of reckless endangerment and armed robbery?

*See id.*, Exhibit 8 at 1.

The Court of Special Appeals of Maryland vacated Chase's sentences for carrying a handgun and reckless endangerment, but otherwise affirmed Chase's convictions and sentences. *Id.*, Exhibit 8.   The intermediate appellate court found the prosecutorial misconduct claim unpreserved because Chase neither objected nor made any other request for relief in response to the State's closing argument.  Id., Exhibit 8 at 10-11.   Chase's challenge to the sufficiency of the evidence underlying the conviction and his challenge to the court's ruling with regard to his examination of a witness also were found unpreserved.  Id., Exhibit 8 at 12-14.

Chase's petition for writ of certiorari raised two issues:

> 1.     Did the prosecutor misstate the law during closing arguments? and
>
> 2.     Was the evidence legally sufficient to sustain appellant's convictions?

*Id.*, Exhibit 9.  The Court of Appeals of Maryland denied Chase's petition for writ of certiorari on April 13, 2007.  *Id.*, Exhibit 10.

6

On June 4, 2007, Chase filed a petition for post-conviction relief in Anne Arundel County Circuit Court.  As amended, the petition alleged:

1.      African-Americans were excluded from serving on the grand jury;

2.      the state excluded African-Americans from serving on the jury at trial;

3.      he was denied a speedy trial;

4.      the prosecutor committed misconduct;

5.      the victim's photo array identification was improperly admitted at trial;

6.      the victim's in-court identification was improperly admitted at trial;

7.      he was wrongfully convicted based on the uncorroborated testimony of an accomplice;

8.      trial counsel was ineffective;

9.      the police coerced confessions;

10.     appellate counsel was ineffective;

11.     the judge who ruled on his new trial motion committed misconduct;

12.     the prosecutor misstated the law in closing argument; and

13.     the trial court failed to award him credit for time in pretrial detention.

Paper No. 16, Exhibits 11-13.  Following a hearing, the post-conviction court denied relief as to all grounds in a memorandum and order filed January 14, 2009.  *Id*., Exhibit 13.  Chase filed a timely application for leave to appeal, but posited no grounds for appeal.  *Id*., Exhibit 1 at 42 and Exhibit 14.  Chase then sought to dismiss the appeal.  The Court of Special Appeals granted his motion to dismiss on April 30, 2009.  *Id*., Exhibits 15 and 16.

## PROCEDURAL DEFAULT

Before a convicted individual may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.  *See Rose*

*v. Lundy*, 455 U. S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. 28 U.S.C. § 2254(b) and (c);  *see   O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).   In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings.  Exhaustion is not required if at the time a federal habeas corpus petition is filed the petitioner has no available state remedy.  *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

When a petitioner fails to present a claim to the highest state court with jurisdiction, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U. S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U. S. 478 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U. S. 41, 46 (1972) (failure to raise claim during post conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post conviction relief).

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus absent a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. at 495; *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977).  Even where a petitioner fails to show cause and prejudice for a procedural default a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U. S.298, 314 (1995).  The miscarriage of justice standard is directly linked to innocence.  *Id*. at 320.  Innocence is not an independent claim; rather; it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id*. at 315.  The miscarriage of justice exception applies where a petitioner shows that

"a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U. S. at 496.

In this federal petition, Chase raises ten of the thirteen claims presented for review in post-conviction proceedings.  Respondents argue that because Chase's current challenges were not raised in an application for leave to appeal the denial of post-conviction relief, they are procedurally defaulted.  The court agrees.  Nothing in the record suggests that Chase was actually innocent of the crimes for which he was convicted.  For reasons stated, the court determines the petition procedurally defaulted and finds no grounds presented that would suggest actual innocence or otherwise justify review on the merits of the grounds presented for habeas corpus relief.  The petition will be denied by separate order.

 October 9, 2009 _____                    _____/s/_____
Date                                                                                    Catherine C. Blake
                                                                                         United States District Judge